UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| TONY WILLIAMS, | 3:12-cv-00660-MMD-WGC |
| Plaintiff, | **REPORT & RECOMMENDATION OF U.S. MAGISTRATE JUDGE** |
| v. | |
| S.L. FOSTER, et. al., | |
| Defendants. | |

This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4. Before the court are Defendants' Motion to Dismiss per FRCP 12(b)(1) and 12(b)(6) (Doc. # 34)[1] and Motion for Summary Judgment per FRCP 56 (Doc. # 40).[2] Plaintiff has opposed the motions (Doc. # 51) and Defendants filed a reply (Doc. # 52).

After a thorough review, the court recommends that Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction be denied (Doc. # 34); however, the court recommends Defendants' motion to dismiss under Rule 12(b)(6) be treated as a motion for summary judgment (Doc. # 40) and be granted.

# I. BACKGROUND

## A. Procedural History

At all relevant times, Plaintiff Tony Williams was in custody of the Nevada Department of Corrections (NDOC). (Pl.'s Sec. Am. Compl., Doc. # 25.) Plaintiff, a pro se litigant, brings this action pursuant to 42 U.S.C. § 1983. (*Id.*) The events giving rise to this action took place

---

[1] Refers to court's docket number.

[2] The motions are identical but were docketed separately by the Clerk's Office.

while he was housed at Ely State Prison (ESP). (*Id.*) Defendants are Sheryl Foster, Renee Baker, and Mike Oxborrow. (*Id.*)

Plaintiff filed his application for leave to proceed in forma pauperis and original Complaint on December 18, 2012. (Doc. # 1.) On April 18, 2013, the court issued a screening order dismissing the complaint in its entirety with leave to amend. (Doc. # 6.) Plaintiff was advised to specifically identify each defendant, clarify what constitutional right he believes each defendant violated, and to support each claim with factual allegations with respect to each defendants' actions. (*Id.*)

On May 20, 2013, Plaintiff filed his First Amended Complaint. (Doc. # 10.)   On September 23, 2013, Defendants filed a report regarding the result of the ninety-day stay even though a ninety-day stay had not been entered in this case at that time. (Doc. # 12.)

On October 2, 2013, the court issued a screening order relative to the First Amended Complaint. (Doc. # 16.) The court allowed Plaintiff to proceed with a single claim against defendants Oxborrow, Baker and Foster that his rights under the Equal Protection Clause of the Fourteenth Amendment were violated in relation to his alleged inability to obtain a lower disciplinary score and move to a lower security institution as a result of his status as an Interstate Corrections Compact (ICC) inmate. (*Id.*) His other claims were dismissed with prejudice. (*Id.*) At the same time, the court entered a ninety-day stay of the action to allow the parties to explore settlement. (*Id.*)

On October 15, 2013, the Attorney General's Office filed a notice of acceptance of service on behalf of Foster, Baker and Oxborrow. (Doc. # 17.) They filed their answer on November 25, 2013. (Doc. # 18.) They filed their status report regarding the ninety-day stay on December 30, 2013, indicating the matter had not settled. (Doc. # 20.)

Plaintiff filed a Second Amended Complaint on February 18, 2014. (Doc. # 25.) Defendants moved to strike the Second Amended Complaint, arguing that it was untimely, was filed without seeking leave of court, and did not attach the proposed amended complaint. (Doc. # 26.) Plaintiff then filed a motion for leave to amend. (Doc. # 27.)

On March 17, 2014, the court entered an order denying Defendants' motion to strike the

Second Amended Complaint, granting Plaintiff's motion for leave to amend, and screening the Second Amended Complaint. (Doc. # 31.) The court allowed Plaintiff to proceed with his equal protection claim in Count I against Oxborrow, Foster, and Baker that he was intentionally treated differently from similarly situated prisoners when he was allegedly not afforded the same opportunity to engage in work opportunities because of his status as an ICC prisoner. (*Id.*) Plaintiff was also allowed to proceed with an equal protection claim in Count II against defendants Foster, Baker and Oxborrow related to his allegations that he was not allowed to transfer to another institution within NDOC so that he could obtain a commutation of his sentence because he was an ICC prisoner. (*Id.*) Finally, he was permitted to proceed with his equal protection claim in Count III based on his allegations that he was treated differently from other Nevada inmates in terms of his Security Threat Group (STG) designation and ability to transfer to lesser custody facilities because of his status as an ICC inmate. (*Id.*)

**B. Summary of the Allegations of the Second Amended Complaint**

    **1. Count I**

        In Count I, Plaintiff alleges that because of his status as an ICC inmate, he was not permitted to gain employment in the highest paying industrial work program possible so he could "amass as much money possible for re-entry into society..." (Doc. # 25 at 5.) He contends other prisoners similarly situated to Plaintiff were allowed to go to medium custody facilities and seek gainful employment in industrial work programs and participate in industrial work programs. (*Id.* at 6.) He grieved this issue to defendant Oxborrow, who denied the grievance. (*Id.* at 7.) He then appealed that decision to defendant Baker, who denied the grievance as well. (*Id.*) Finally, he appealed that decision to defendant Foster, who likewise denied the grievance. (*Id.*)

    **2. Count II**

        In Count II, Plaintiff asserts that he was transferred to Nevada from Washington with a classification score of 57 points, which he claims equates to a minimum classification designation. (Doc. # 25 at 9.) He claims that when he got to Nevada, he could not receive a classification designation less than medium because of his conviction and length of sentence. (*Id.*)

- 3 -

1    Plaintiff also avers that he wanted to apply for a commutation of his sentence, but this

2  required a transfer away from ESP, a maximum security prison. (*Id.*) Plaintiff sought and was

3  denied transfer to another institution. (*Id.* at 10-11.)  He says he was told he could not be moved

4  from ESP because of his gang affiliations, which he disputes, and claims that he then set about

5  having this information expunged from his records. (*Id.* at 11.) He was unsuccessful in his

6  efforts. (*Id.*) In addition, he contends that NDOC was transferring other prisoners to medium

7  security prisons that had actual gang affiliations. (*Id.*) Plaintiff contends he was also denied

8  transfer because he had an escape history. (*Id.*)  In response, Plaintiff told prison administrators

9  that he had merely jumped a fence inside the prison and went out of bounds, but had not

10  attempted to leave the prison. (*Id.*) He claims that NDOC was allowing inmates who actually had

11  a history of escape to transfer to medium custody facilities. (*Id.* at 12.)

12    Plaintiff was then told that his confinement at ESP was due to his points. (*Id.*) He

13  maintains that prisoners with scores greater than his were allowed to reduce their points while

14  Plaintiff was not. (*Id.*)

15    Plaintiff claims that he asked a caseworker why he was being discriminated against and

16  she said it was because he was an ICC inmate. (*Id.* at 13.)

17    As with Count I, Plaintiff claims that he raised these issues to defendants Foster, Baker

18  and Oxborrow, to no avail. (*Id.* at 14.)

19    **3. Count III**

20    In Count III, Plaintiff states that he endured thirteen and a half years of discrimination

21  and deprivation of opportunities to obtain rehabilitation. (*Id.* at 15.) He claims he was never

22  given an STG designation in Hawaii or Washington, but he did receive such designation from

23  Nevada. (*Id.*) He claims that Nevada refused to lift the STG designation. (*Id.*) He mentions again

24  that other validated gang members were allowed to transfer to lesser custody facilities while

25  Plaintiff was not. (*Id.*) He likewise re-alleges that inmates with actual history of escape were also

26  permitted to transfer to lesser-custody facilities while he was not. (*Id.* at 16.) He goes on to re-

27  allege what is asserted in Count I. (*Id.* at 16-17.)

28  ///

- 4 -

**C. Defendants' Motion**

    **1. Background**

        On March 31, 2014, Defendants filed their Motion to Dismiss Per FRCP 12(b)(1) and 12(b)(6), and Motion for Summary Judgment Per FRCP 56. (Docs.# 34, # 40.) Preliminarily, Defendants state that Plaintiff was convicted of first degree murder in Hawaii in 1988 for killing a police officer and was sentenced to life in prison without the possibility of parole. (Docs. # 34/40 at 1; Pl.'s Response to Defs.' Request for Admission 2 (Doc. # 34-1 at 2-3).)  He was initially housed in Hawaii, and then transferred pursuant to the ICC to Washington, and subsequently to Nevada. (Docs. # 34/40 at 1-2; Pl.'s Response to Defs.' Request for Admission 3 (Doc. # 34-1 at 3).) Plaintiff entered ESP in March of 2000. (Docs. # 34/40 at 2; Pl.'s Response to Defs.' Request for Admission 1 (Doc. # 34-1 at 2).) Plaintiff eventually began to request transfers to medium security housing facilities. (Docs. # 34/40 at 2; Doc. # 34-2 at 2-4.)

        They then point out that during his thirteen years at ESP, Plaintiff's requests for a transfer were denied because a combination of four factors acted as an override to traditional classification scoring: (1) he was convicted of killing a police officer; (2) he was serving a sentence of life in prison without the possibility of parole; (3) the State of Hawaii submitted correspondence to NDOC that Plaintiff was a gang member and possible gang leader who was involved in a Hawaii Department of Corrections Investigation; and (4) the State of Washington submitted correspondence to NDOC that Plaintiff had attempted to escape from a Washington correctional facility. (Docs. # 34/40 at 2; Doc. # 49-1 at 2 ¶ 5 (Byrne Decl.).)[3] They do note that Plaintiff was granted medium security status and transferred out of ESP to High Desert State Prison (HDSP) on September 5, 2013, as a result of a significant pattern of good behavior and few disciplinary charges. (Docs. # 34/40 at 2; Doc. # 49-1 at 3 ¶¶ 8-9.)

    **2. Subject Matter Jurisdiction**

        Defendants argue that the court does not have subject matter jurisdiction over Plaintiff's claims because the Ninth Circuit has already determined that the ICC, which forms the basis of Plaintiff's claims, is not federal law. (Docs. # 34/40 at 6-8.)

---

[3] Harold Byrne is an Associate Warden at ESP. (Doc. # 49-1 at 2 ¶ 4.)

1  **3. Equal Protection**

2  Next, they contend that even if the court has subject matter jurisdiction over the action,

3  Plaintiff cannot prove NDOC's reasons for keeping him at ESP (*i.e.,* he was convicted of killing

4  a law enforcement officer serving a life without possibility of parole sentence, was a suspected

5  gang affiliate in Hawaii, and had attempted an escape in Washington) were not rationally related

6  to legitimate penological interests of safety and security. (Docs. # 34/40 at 9-12.) In addition,

7  they state that Plaintiff does not meet the requirements for a "class of one" entitled to equal

8  protection which requires that he establish there is no rational basis for the conduct at issue. (*Id.*

9  at 9-16.)

10  **4. Standing and Mootness**

11  Defendants further argue that Plaintiff lacks standing because he cannot show an actual

12  injury that is causally linked to the challenged conduct. (Docs. # 34/40 at 17-20.)

13  Defendants likewise assert that Plaintiff's claims are moot because he has already been

14  transferred out of ESP to a medium security facility and it is likely he will be transferred back to

15  Hawaii in the near future. (*Id.* at 20-21.)

16  **5. Statute of Limitations**

17  Finally, Defendants maintain that any claims or damages arising before December 18,

18  2010 are barred by the state of limitations. (Docs. # 34/40 at 22-23.)

19  **II. MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

20  **A. Legal Standard**

21  A party may file a motion to dismiss for lack of subject-matter jurisdiction. Fed. R. Civ.

22  P. 12(b)(1). Federal courts are courts of limited jurisdiction, adjudicating only cases which the

23  Constitution and Congress authorize. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375,

24  377 (1994). "The party asserting federal subject matter jurisdiction bears the burden of proving

25  its existence." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121-22 (9th Cir.

26  2010).

27  Federal courts derive their power from Article III, section 2 of the Constitution, which

28  "delineates the absolute limits on the federal courts' jurisdiction," *Ankenbrandt v. Richards*, 504

U.S. 689, 695 (1992), which extends to "... all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their authority;" "... all Cases of admiralty and maritime jurisdiction;" "... Controversies to which the United States shall be a Party;" "... Controversies between two or more States; between a State and Citizens of another State; between Citizens of different States; between Citizens of the same State claiming Lands under Grants of different States, and;" "... [Controversies] between a State, or the Citizens thereof, and foreign States, Citizens or Subjects." U.S. Const. Art. III, § 2.

Insofar as statutes provide for federal court jurisdiction, in general, 28 U.S.C. § 1331 confers general "federal question" jurisdiction, and 28 U.S.C. § 1332 confers "diversity" jurisdiction. Section 1331 provides district courts with "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Various other statutes provide the courts with jurisdiction regarding specific subject matters, including 28 U.S.C. § 1343(a)(3), which gives district courts original jurisdiction over any civil action "[t]o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

There are two types of motions to dismiss for lack of subject matter jurisdiction: a facial attack and a factual attack. *Thornhill Publishing Co. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979). Thus, a party may either make an attack on the allegations of jurisdiction contained in the nonmoving party's complaint, or may challenge the existence of subject matter jurisdiction in fact, despite the formal sufficiency of the pleadings. *Id*. Defendants' motion presents a factual attack.

In the case of a factual attack, "no presumptive truthfulness attaches to the plaintiff's allegations." *Thornhill*, 594 F.2d at 733 (internal citation omitted). When a party files a motion to dismiss for lack of subject matter that is not based on the allegations contained in the complaint alone, but instead rests on extrinsic evidence, the court may weigh the evidence to determine jurisdiction. *See Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987); *Rosales v. United*

1    *States*, 824 F.2d 799, 803 (9th Cir. 1987).

2         However, "jurisdictional finding of genuinely disputed facts is inappropriate when the

3    jurisdictional issues and substantive issues are so intertwined that the question of jurisdiction is

4    dependent on the resolution of factual issues going to the merits of the action." *Safe Air for*

5    *Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (internal citations and quotations

6    omitted).

7    **B. Discussion**

8         **1. Summary of Argument**

9         Defendants acknowledge that Plaintiff was permitted to proceed with his section 1983

10   action claims that Defendants violated the Fourteenth Amendment's Equal Protection Clause.

11   (Docs. # 34/40 at 6-7.) They contend, however, that section 1983 requires (as an element of the

12   an action) that Plaintiff establish a violation of a right secured by the Constitution or laws of the

13   United States, and Plaintiffs claims are really centered on the ICC, which the Ninth Circuit has

14   found is not federal law. (*Id*. at 7, citing *Ghana v. Pearce*, 159 F.3d 1206 (9th Cir. 1998).)

15   Therefore, they assert that a violation of the ICC cannot be the basis for a section 1983 action,

16   and there is no federal question which would vest the court with subject matter jurisdiction. (*Id*.

17   at 8, citing *Ghana*, 159 F.3d at 1209 and *Stewart v. McManus*, 924 F.2d 138, 142 (8th Cir.

18   1991).)

19        Plaintiff first argues, as he has in prior filings, that the court's subject matter jurisdiction

20   is invoked by the virtue of the impairment of the interstate compact, which is prohibited by

21   Article I, Section 10 of the United States Constitution. (Doc. # 51 at 3.)

22        He then argues that under 28 U.S.C. § 1343, the district court has original jurisdiction

23   over any action commenced by any person "to redress the deprivation, under color of any State

24   law, statute, ordinance, custom or usage, of any right, privilege, or immunity secured by the

25   Constitution of the United States or by an Act of Congress providing for equal rights of

26   Citizens..." (Doc. # 51 at 3.)

27        He also states that the court may exercise pendant jurisdiction as a result of his allegation

28   that Defendants' actions violated rights conferred upon Plaintiff pursuant to Nevada Revised

1    Statute 215A.020. (*Id.*)

2        Finally, he asserts that Defendants violated his right to equal protection under the

3    Fourteenth Amendment. (*Id.*)

4        In their reply, Defendants argue that 28 U.S.C. § 1343 cannot establish jurisdiction when

5    subject matter jurisdiction "would be void on other grounds." (Doc. # 52 at 2-3, citing *Stanislaus*

6    *Food Products Co. v. Pub. Util. Comm'n*, 560 F.Supp. 114, 118 (N.D. Cal. 1982); *Deleo v.*

7    *Rudin*, 328 F.Supp.2d 1106, 1114 (D. Nev. 2004).)

8        As to Plaintiff's argument that the court may exercise pendant jurisdiction as a result of

9    his claims under Nevada Revised Statute 215A.020, Defendants respond that this statute deals

10   with the ICC, which cannot be the basis of a claim under section 1983. (Doc. # 52 at 3.) In

11   addition, they point out that while Plaintiff references this statute, it does not create an

12   independent state tort or contract claim. (*Id.*)

13       **2. Analysis**

14       The court disagrees with Defendants' argument that it lacks subject matter jurisdiction

15   over Plaintiff's claims. Section 1983 unquestionably provides a cause of action against persons

16   acting under color of state law who have violated rights guaranteed by the Constitution and laws

17   of the United States. 42 U.S.C. § 1983; *see also West v. Atkins,* 487 U.S. 42, 48 (1988) ("To state

18   a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution

19   and laws of the United States..."); *accord Buckley v. City of Redding*, 66 F.3d 188, 190 (9th Cir.

20   1995). In other words, a plaintiff pursuing an action under section 1983 may do so by alleging:

21   (1) his rights under the Constitution have been violated; (2) his rights under federal law have

22   been violated; (3) or both. In this case, Plaintiff was not permitted to proceed with a claim that

23   his rights were infringed through a violation of the ICC (which the court acknowledges the Ninth

24   Circuit has held is not federal law). Instead, Plaintiff's complaint was construed as stating

25   colorable claims that his *constitutional* right to equal protection under the laws was violated

26   when Defendants treated him differently than non-ICC inmates housed within NDOC. Under

27   these claims, the court has federal question subject matter jurisdiction pursuant to 28 U.S.C.

28   § 1331 and § 1343(a)(3).

1   Defendants' reliance on *Ghana v. Pearce*, therefore, is misplaced. In that case, the inmate

2   prisoner appealed a decision dismissing his section 1983 action on summary judgment. *Ghana v.*

3   *Pearce*, 159 F.3d 1206, 1207 (9th Cir. 1998). Ghana involved an inmate who was transferred

4   from the New Jersey prison system to the Oregon prison system pursuant to the ICC. *Id.* While

5   housed within Oregon's prisons, Ghana was subjected to various disciplinary proceedings

6   conducted pursuant to Oregon prison regulations, and he argued the hearings were defective

7   because under the ICC, he should have been entitled to the protections of New Jersey's rules. *Id.*

8   He argued that the Oregon prison's failure to apply New Jersey's rules denied him of his rights in

9   violation of section 1983. *Id.*[4]

10   Defendants fail to point out that the court in *Ghana* was *not* determining whether or not

11   the district court had subject matter jurisdiction over Ghana's action. Instead, the court was

12   deciding whether Plaintiff established a claim under section 1983, either through the alleged

13   violation of the ICC or through his allegation that his constitutional right to due process was

14   violated, *i.e.,* whether there was a violation of federal law or the Constitution (the two

15   mechanisms for bringing a 1983 action). *Id.* at 1208. The Ninth Circuit therefore had to

16   determine whether the ICC was federal law or, in the alternative, whether the ICC created a

17   liberty interested protected by the Due Process Clause of the Fourteenth Amendment. *Id.*

18   First, the court found that "[a] state compact is transformed into federal law, and thus

19   may be the basis for a 1983 action, when (1) it falls within the scope of the Constitution's

20   Compact Clause, (2) it has received congressional consent, and (3) its subject matter is

21   appropriate for congressional legislation." *Id.* (citing *Cuyler v. Adams*, 449 U.S. 433, 440 (1983)).

22   It determined that the ICC was not federal law. *Id.* Therefore, Ghana could not bring a 1983

23   action on the basis that the defendants had violated a right secured by federal law.

24   Second, the court found that the ICC did not create a protected liberty interest in that case

25   because, applying the substantive law for due process claims, Ghana did not assert "that the

26   Oregon procedures he was subjected to were so deficient as to violate due process of their own

27

28   [4] The ICC provided, *inter alia*: "The fact of confinement in a receiving state shall not deprive any inmate so confined of any legal rights which said inmate would have had if confined in an appropriate institution of the sending state."

accord." *Id*. at 1209. Nor did the procedures applied by the Oregon prison system (instead of the New Jersey rules) "impose an 'atypical and significant' hardship'" on Ghana "in relation to the ordinary incidents of prison life." *Id*. (citing *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). Therefore, Ghana had not established a violation of the Constitution.

Because the ICC was not federal law and did not create a protected liberty interest in that case, the Ninth Circuit held that there was no basis in federal law or the Constitution for Ghana's section 1983 action. *Id*.

Defendants' analysis erroneously focuses only on the federal law portion of Ghana's claim, and argues that the Ninth Circuit's conclusion that the ICC is not federal law precludes Plaintiff's action in this case. (Doc. # 34 at 7-8.) Defendants pass over the fact that in *Ghana* the court *also* analyzed whether the plaintiff could establish his claim that his due process rights under the Constitution were violated.  Here, Plaintiff is not proceeding with a claim that his rights under federal law were infringed when the ICC was violated. Instead, he is alleging that he was treated differently from other inmates because he was an ICC inmate, in violation of his rights under the Equal Protection Clause of the Constitution. This implicates the alternative constitutional mechanism of bringing a section 1983 claim. This also invests the court with federal question subject matter jurisdiction.

Now, whether or not Plaintiff's rights under the Equal Protection Clause were *in fact* violated goes to the merits of Plaintiffs' claims, and not to whether the court may exercise subject matter jurisdiction. This argument is made pursuant to Rule 12(b)(6) in a motion for failure to state a claim upon which relief may be granted, (or a motion for summary judgment when the party relies on materials outside the pleadings, which Defendants do here) and which the court will address *infra*.

This is actually illustrated by *Ghana*. Defendants overlook the critically important fact that in *Ghana* (where the Court concluded that a violation of the ICC was not federal law and that Ghana's constitutional due process rights had not in fact been violated), the Ninth Circuit specifically stated at the outset that the district court *did in fact have subject matter jurisdiction* under 28 U.S.C. § 1331 and § 1343. *Ghana,* 159 F.3d at 1207.  While *Ghana* did not address this

- 11 -

1   issue, the district court presumably would not have had subject matter jurisdiction over *Ghana* if

2   Ghana had just brought an action under section 1983 on the basis of the violation of the ICC,

3   which he contended was federal law. The fact remains, however, that Ghana's 1983 action was

4   also based on the alleged violation of the Constitution's Due Process Clause. The Ninth Circuit

5   ultimately determined that Ghana's constitutional rights under the Due Process Clause were not

6   violated; yet, that did not deprive the court of subject matter jurisdiction.

7   In sum, Plaintiff's constitutional claims under the Equal Protection Clause invoke subject

8   matter jurisdiction under 28 U.S.C. § 1331 and § 1343. Like in *Ghana,* this does not change even

9   if the court's findings on the merits of these claims are adverse to Plaintiff. Therefore,

10  Defendants' motion to dismiss this action pursuant to Rule 12(b)(1) for lack of subject matter

11  jurisdiction should be denied.

12  Incidentally, insofar as Plaintiff argues that the court's subject matter jurisdiction is

13  invoked by the virtue of the impairment of the interstate compact, which is prohibited by

14  Article I, Section 10 of the United States Constitution (Doc. # 51 at 3), the court has advised

15  Plaintiff on various occasions that he did not state a claim under the Contract Clause, and such a

16  claim was dismissed with prejudice from this action. Therefore, this cannot be the basis for the

17  court to exercise subject matter jurisdiction over this action.

18  Moreover, the fact that a court may exercise supplemental jurisdiction over state law

19  claims does not provide a basis for the court exercising federal subject matter jurisdiction over

20  the action as an initial matter. The court must first have original federal subject matter

21  jurisdiction over the action before it may exercise supplemental jurisdiction over state law

22  claims. 28 U.S.C. § 1367(a). Further, as Defendants point out, while Plaintiff makes reference to

23  Nevada Revised Statute 215A.020, the statute merely sets out the text of the ICC and does not, in

24  and of itself, create an independent state contract or tort claim.

25  **III. MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (Fed. R. Civ. P.**

26  **12(b)(6)); MOTION FOR SUMMARY JUDGMENT (Fed. R. Civ. P. 56)**

27  **A. Legal Standard**

28  Defendants' acknowledge that when a motion to dismiss relies on material outside of the

pleadings, the court must construe the motion as one for summary judgment (Docs. # 34/40 at 4). Therefore, because Defendants rely on materials outside of the pleadings in their substantive arguments relative to Plaintiff's equal protection claims, the court will treat the motion as one for summary judgment. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A), (B).

If a party relies on an affidavit or declaration to support or oppose a motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

In evaluating whether or not summary judgment is appropriate, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine dispute as to a material fact; and (3) considering the evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary

judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id*. at 248.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'...In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a genuine dispute of material fact, the opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

That being said,
[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that

1    the movant is entitled to it; or (4) issue any other appropriate order.

2    Fed. R. Civ. P. 56(e).

3        At summary judgment, the court's function is not to weigh the evidence and determine

4    the truth but to determine whether there is a genuine dispute of material fact for trial. *See*

5    *Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all

6    justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is

7    merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-

8    50 (citations omitted).

9    **B. Analysis**

10       **1. Summary of Defendants' Argument & Evidence**

11       Defendants assert that because Plaintiff's allegations do not implicate a "suspect" or

12   "quasi-suspect" class, rational basis review applies, and the court must consider whether

13   Defendants' action is rationally related to a legitimate governmental interest. (Docs. # 34/40 at 9,

14   citing *Ball v. Massanari*, 254 F.3d 817, 823 (9th Cir. 2001); *Glauner v. Miller*, 184 F.3d 1053,

15   1054 (9th Cir. 1999).) In addition, they contend that because Plaintiff is only one man, the court

16   must determine whether he can satisfy the requirements of creating a "class of one": that he was

17   intentionally treated disparately than others who are similarly situated, and there was no rational

18   basis for the differential treatment. (Docs. # 34/40 at 9.) According to Defendants, the factors

19   that went into deciding Plaintiff's classification score were and the reasons for keeping him at

20   ESP for so long were: (1) that he killed a police officer; (2) he was serving a sentence of life in

21   prison without the possibility of parole; (3) he was a gang member and possibly a gang leader

22   who presented a management problem for Hawaii; and (4) he had one verified escape attempt in

23   Washington and another possible escape attempt in Hawaii. (Doc. # 49-1 at 2 ¶ 5 (Bryne Decl.).)

24       Defendants maintain that Plaintiff's status as a convicted killer of a law enforcement

25   official serving a sentence of life without the possibility of parole, gang affiliation and escape

26   attempt were legitimate reasons for keeping him at ESP. (Doc. # 34 at 10-11, citing *In re Long*

27   *Term Administrative Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 468-

28   469 (4th Cir. 1999) (applying rational basis review to prison's decision to classify persons

belonging to STG).)

First, the conviction for killing a police officer in the back of the head resulted in Plaintiff being deemed a security risk, as it showed a lack of respect for authority and utilization of the element of surprise in the underlying act. (Doc. # 49-1 at 2 ¶ 6.) When NDOC receives inmates pursuant to the ICC, it is given copies of the convicting state's presentence investigation report (PSI), which details the facts of the crime. (Docs. # 34/40 at 16.) From Plaintiff's PSI, NDOC observed that Plaintiff shot a police officer who was scheduled to testify against him in a drug case three times in the back of the head. (*Id.;* Doc. # 49-3 at 2-17.) Defendants assert that the severity of Plaintiff's underlying crime serves as a rational basis for keeping Plaintiff at ESP. (Doc. # 34 at 15-16, citing *Abney v. Almeida*, 334 F.Supp.2d 1221 (S.D. Cal. 2004) (holding that prison identified legitimate governmental interest in treating low security inmates differently than high security inmates based on the nature and severity of the crimes committed and the length of the sentence imposed).)

Second, Defendants state that Hawaii identified Plaintiff at the beginning of his transfer and in the middle of his sentence as a gang member. (Docs. # 34/40 at 12; Doc. # 49-2.) Specifically, when he was initially transferred in 2000, NDOC relied on official reports from Hawaii, who provided a detailed account of Plaintiff's gang affiliation, with the director of Hawaii prisons noting that he was a member of a gang and attempted to organize gangs at one of their facilities, and communicated to other gang members using recognized gang signs (which Hawaii had interpreted by the Los Angeles Police Department). (Doc. # 49-1 at 3 ¶ 7.) While Plaintiff has denied gang affiliation on many occasions, NDOC relied on the information from Hawaii, although it did investigate Plaintiff's claims that Hawaii was mistaken. (*Id.*) As recently as 2012, Hawaii confirmed it would not change Plaintiff's STG status after conducting a re-investigation. (*Id.*)

Third, Defendants address Plaintiff's escape attempts. They provide a declaration from Shari Kimoto, Administrator for the Mainland Branch, Department of Public Safety in Hawaii, who is responsible for the oversight of contract compliance for the housing of Hawaii inmates in out-of-state correctional facilities. (Doc. # 34-10 at 2 ¶ 4.) She states that in 1988, a confidential

1   informant reported to prison staff that Plaintiff was planning an escape, and while he never made

2   an active escape attempt, he was transferred to more secure housing as a precaution. (*Id*. ¶ 5.)

3        In addition, NDOC followed up on Plaintiff's claims that he did not attempt to escape in

4   Washington. (Doc. # 35-1 at 5-6 ¶ 13.) Washington confirmed that on July 24, 1997, tower

5   officers observed Williams running down the fence line and the tower officer ordered Plaintiff to

6   halt four times. (*Id*.) Williams then scaled the fence and went into a restricted area. (*Id*.) An

7   officer gave a warning shot and Plaintiff raised his hands, and then broke into a run and fled

8   toward an industrial building. (*Id*.) Plaintiff finally took heed of the warnings, and was taken into

9   custody. (*Id*.)

10       Defendants assert that given the information they were given about Plaintiff's escape

11  attempts in both Hawaii and Washington, their decision to use this as a consideration in his

12  classification was rationally related to the determination to keep him at ESP. (Doc. # 52 at 12-13,

13  citing *Smith v. Coughlin*, 748 F.2d 783, 787-788 (2nd Cir. 1984); *Pargo v. Elliott*, 849 F.Supp.

14  1243, 1278 (S.D. Iowa 1995); *Wishon v. Gammon*, 978 F.2d 446, 449-500 (8th Cir. 1992).)

15       Fourth, Defendants assert that classification is determined by the use of a standard

16  classification instrument assessment form, regardless of whether the inmate was convicted in

17  Nevada or is housed here pursuant to the ICC. (Doc. # 35-1 at 2 ¶¶ 5-6.) Sections A and B of the

18  form determine the risk factor points total. (*Id*. at 3 ¶ 9.)

19       Section A of the form analyzes the history of institutional violence as well as current and

20  prior offense severity. (*Id*. at 2 ¶ 7.) If an inmate scores a ten on this section, they are ineligible

21  for minimum security. (*Id*.) Plaintiff's score on this section is an 8 based on his current and prior

22  offense severity (this score would only change if he incurred points for institutional violence).

23  (*Id*.)

24       Section B of the form analyzes escape history, disciplinary record, if the inmate has any

25  holds/detainers, the number of prior felony convictions and the percentage of his time served.

26  (*Id*. at 3 ¶ 8.) Plaintiff received five points in this section for his escape history, four points

27  because he has two or more prior felony convictions and three points because he served less than

28  twenty-five percent of his time. (*Id*.) None of these points will change for Plaintiff. (*Id*.) While

1    many inmates' points for percentage of time served will go down over time, Plaintiff's will not

2    because he is serving a sentence of life without possibility of parole. (*Id*.) This gives him twelve

3    points, but due to his having gone over thirteen months without a guilty disciplinary finding or

4    disciplinary plea of guilt, he has a reduction of three points, for a total of nine points in section B.

5    (*Id*.) Thus, his total score for sections A and B is seventeen, which has been consistent for a

6    number of years. (*Id*.)

7        Section C looks at factors that would preclude minimum custody, and includes factors

8    such as whether the inmate is a sex offender; has had a violent episode in the last year; is more

9    than thirty-six months to probable release; has an NDOC escape or attempted escape; has a

10   death, life without or former death sentence; has a felony hold/detainer; is a Central Monitoring

11   Case; has a mental health restriction precluding minimum custody; is in protective custody,

12   disciplinary segregation or detention. (*Id*. ¶ 9.) Plaintiff has multiple life without possibility of

13   parole sentences, which means he is more than thirty-six months to probable release, which

14   preclude minimum custody in and of themselves, apart from non-NDOC escape history. (*Id*.)

15       Classification staff members have certain discretionary authority regarding the ability to

16   override a classification score in either direction (resulting in a higher or lower custody

17   determination). (*Id*. at 3-4 ¶ 10.) The central focus in an override determination is the safety and

18   security of the public, inmates and staff. (*Id*.) One of NDOC's goals is to house inmates in the

19   lowest possible custody level consistent with safety concerns. (*Id*. at 4-5 ¶ 12.) Inmates are

20   reviewed by classification staff every six months. (*Id*.) If "no change" is recommended, that

21   decision is reviewed and approved by the caseworker supervisor at the institutional level. (*Id*.)

22   Offender Management Division reviews and has final authority on any recommendations for

23   minimum custody or lower, or those which recommend movement of an inmate from one

24   institution or facility. (*Id*.) In addition, ESP has full classification committee hearings to

25   determine whether an inmate can and should be recommended for a reduction in custody, which

26   would include transfer to another instituting, requiring the Offender Management Division to

27   review and approve or deny such a recommendation. (*Id*.)

28       In August of 2011, prior the filing of this lawsuit, Plaintiff was reviewed for

1    reclassification, and his score of seventeen was considered borderline, but because of good

2    institutional behavior he received full classification committee review for possible custody

3    reduction. (*Id*. at 5 ¶ 13.) At that time, Plaintiff stated that he did not attempt to escape from the

4    Washington prison, but merely scaled a perimeter fence after being late. (*Id*.) The committee

5    called Washington, as indicated *infra,* and Washington's description of the incident did not

6    corroborate Plaintiff's claim. In spite of this information, the committee decided to submit

7    Plaintiff to medium custody at HDSP, which meant the recommendation had to be reviewed by

8    the Offender Management Division. (*Id*. at 6 ¶ 13.) The Offender Management Division

9    ultimately denied reclassification at that time due to Plaintiff's sentence structure and history.

10   (*Id*.)

11         When Plaintiff appeared for a reclassification review on July 31, 2012, Plaintiff stated he

12   wanted to return to Hawaii; as such, NDOC undertook efforts to determine whether Hawaii

13   would accept Plaintiff. (*Id*. ¶ 15.) At that time, Hawaii declined to take him back. (*Id*.)

14         Plaintiff had another reclassification hearing on July 22, 2013, where a full classification

15   panel convened due to Plaintiff's borderline score. (*Id*. ¶ 16.) This time, he did not try to justify

16   or minimize his escape attempt. (*Id*.) Because of this, and because it was noted that the

17   Washington escape did not result in criminal charges, Plaintiff was recommended for transfer to

18   medium security. (*Id*.) The Offender Management Division reviewed and approved the decision,

19   and Plaintiff was transferred to HDSP. (*Id*.) According to Dwayne Deal, it is likely that his two

20   additional years of positive institutional adjustment at ESP had something to do with this

21   decision. (*Id*.)

22         Defendants also note that as a result of staff changes in the Offender Management

23   Division and "PREA" (Prison Rape Elimination Act) implementation resulted in a review of ICC

24   contracts, and during this process it was discovered that the ICC contract with Hawaii had

25   expired in 2004. (*Id*. at 7 ¶ 18.) When NDOC attempted to renew the contract, it learned that due

26   to overcrowding issues in its prisons, Hawaii could not live up to the term of contract providing

27   that for every day Nevada houses a Hawaii inmate, Hawaii must house a Nevada inmate. (*Id*. ¶

28   19.) Therefore, the ICC contract with Hawaii is not being renewed, and Plaintiff will be returned

1   to Hawaii. (*Id*. ¶¶ 19-20.)

2          Finally, Dwayne Deal states that there are no other inmates in custody of NDOC that

3   have been convicted of first degree murder of a police officer, are serving a life without

4   possibility of parole sentence, have an escape history and STG affiliation. (*Id*. at 7-8 ¶ 21.) As

5   such, Defendants maintain that Plaintiff cannot establish that he suffered disparate treatment

6   when compared to similarly situated inmates. (Docs. # 34/40 at 14.)

7          **2. Summary of Plaintiff's Argument**

8          Plaintiff appears to argue that Defendants admit that Plaintiff was treated differently than

9   similarly situated inmates when Dwayne Deal stated in his declaration that there are no similarly

10  situated inmates within NDOC. (Doc. # 51 at 4-5.)

11         Plaintiff further argues that genuine issues of material fact exist to defeat summary

12  judgment, including: (1) whether NDOC was authorized to place Plaintiff in a maximum security

13  prison based upon their regulations; (2) whether Defendants were authorized to treat Plaintiff

14  equally to NDOC prisoners; (3) whether there was a rational basis for Defendants subjecting

15  Plaintiff to disparate treatment based on his alleged gang affiliation (he maintains he is not and

16  has never been a gang member or affiliated with any gang); (4) whether there was a rational

17  basis for subjecting Plaintiff to unequal treatment on the basis that he had attempted to escape

18  (he maintains he never attempted to escape and that Defendants have no evidence he did). (Doc.

19  # 51 at 7-11.)

20         **3. Summary of Defendants' Reply**

21         In their reply, Defendants argue that Plaintiff misunderstands the requirement of

22  comparing himself to similarly situated inmates when he asserted that Dwayne Deal's admission

23  that there are no other inmates like Plaintiff in the NDOC proves that he was treated differently

24  than other inmates. (Doc. # 52 at 3-4.) Defendants point out that to be successful on an equal

25  protection claim involving a "class of one," Plaintiff must show he was intentionally treated

26  differently than others who are similarly situated with no rational basis. (*Id*.) Defendants

27  maintain that Plaintiff cannot establish he was treated differently than other similarly situated

28  inmates because he cannot show there are any similarly situated inmates. (*Id*. at 4.)

1    Defendants also argue that there are no remaining questions of fact to be determined. (*Id.*)

2    First, they contend that Plaintiff was not permitted to proceed with a contract claim. (*Id.*)

3    Moreover, he was placed at ESP by virtue of his classification score and an overriding threat of

4    escape. (*Id.* at 5, citing *Garcia v. Lemaster*, 439 F.3d 1215, 1219 (10th Cir. 2006).)

5    Second, they assert that there is no question of fact regarding whether Plaintiff was

6    treated disparately from other inmates because a mathematical formula was used to determine

7    Plaintiff's as well as other NDOC inmates' housing placement. (*Id.*)

8    Third, Defendants contend that it is not relevant whether Plaintiff was actually a gang

9    member or not; instead, the relevant question is whether NDOC had information to justify using

10   STG status as a classification factor. (*Id.* at 5-6.) Nevertheless, they point out that when Plaintiff

11   challenged this by seeking an STG review hearing, NDOC went back to Hawaii and asked if

12   they had changed their view on Plaintiff's STG status, and Hawaii confirmed it had not. (*Id.* at 6.)

13   Therefore, NDOC properly operated based on the information regarding Plaintiff's STG status

14   from Hawaii (the convicting state and where the gang affiliation was personally observed). (*Id.*)

15   Fourth, Defendants address the use of Plaintiff's prior escape attempt to classify him. (*Id.*)

16   They state that they relied on information from the State of Washington, where the attempt was

17   observed. (*Id.*) Moreover, NDOC conducted several investigations into the escape and sought

18   further details to determine whether or not it should be an override to a borderline classification

19   score. (*Id.*)

20   **4. Analysis**

21   The Fourteenth Amendment prohibits the denial of "the equal protection of the laws."

22   U.S. Const. amend. XIV, § 1. "The Equal Protection Clause requires the State to treat all

23   similarly situated people equally." *Hartmann v. California Dept. of Corrections and*

24   *Rehabilitation,* 707 F.3d 1114, 1123 (9th Cir. 2013) (citing *City of Cleburne v. Cleburne Living*

25   *Ctr.,* 473 U.S. 432, 439 (1985)). "This does not mean, however, that all prisoners must receive

26   identical treatment and resources." *Id.* (citations omitted). "To state a claim under 42 U.S.C.

27   § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff

28   must show that the defendants acted with an intent or purpose to discriminate against the plaintiff

1   based upon membership in a protected class.'" *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th

2   Cir. 1998)). Where state action "does not implicate a fundamental right or suspect classification,

3   the plaintiff can establish a 'class of one' equal protection claim by demonstrating that [he] 'has

4   been intentionally treated differently from others similarly situated and that there is no rational

5   basis for the difference in treatment.'" *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 944

6   (9th Cir. 2004), *overruled on other grounds by Shanks v. Dressel*, 540 F.3d 1082, 1087 (9th Cir.

7   2008)).

8          "[T]he protections of the Fourteenth Amendment extend to state prisons." *Walker v.*

9   *Gomez*, 370 F.3d 969, 974 (9th Cir. 2004) (citing *Lee v. Washington*, 390 U.S. 333, 334 (1968)).

10  "In the prison context, however, even fundamental rights such as the right to equal protection are

11  judged by a standard of reasonableness—specifically, whether the actions of prison officials are

12  'reasonably related to legitimate penological reasons.'" *Id.* (citing *Turner v. Safley*, 482 U.S. 78,

13  89 (1987); *Jordan v. Gardner*, 986 F.2d 1521, 1530 (9th Cir. 1993)).[5]

14         Plaintiff alleges that he was discriminated against based on his ICC status. He contends

15  that as a result he was not allowed to obtain work opportunities or transfer to a lower custody

16  facility. He avers that other inmates who had gang affiliations, escape attempts and similar or

17  worse classification scores were given work opportunities and were permitted to transfer to

18  lower custody facilities.

19         Plaintiff's allegations do not implicate a fundamental right, suspect or quasi-suspect

20  classification.[6] Therefore, rational basis scrutiny under *Turner* applies to this case. *See Walker,*

---

21         [5] Racial classification, however, is still governed by the strict scrutiny standard, which requires that the

22  state show the racial classification is "narrowly tailored" and "further compel[s] governmental interests," and not the
    more lenient rational basis standard set forth in *Turner*. *See Johnson v. California*, 543 U.S. 499, 505 (2005).

23  *Turner* has been applied in addressing First Amendment challenges (freedom of association, limits on inmate
    correspondence, restrictions on access to the courts, restrictions on receipt of subscription publications, work rules

24  limiting prisoners' attendance at religious services), some due process claims (involuntary medication of mentally ill
    prisoners), and restrictions on the right to marry. *See id.* at 510 (citations omitted).

25

26         [6] As stated above, race is a suspect classification subject to strict scrutiny. National origin is also a suspect
    classification subject to strict scrutiny. *Hernandez v. State of Texas*, 347 U.S. 475 (1954). Fundamental rights

27  include voting, interstate travel, access to a fair trial, family rights and personal autonomy, and apply strict scrutiny.
    *See Kramer v. Union Free School Dist. 15*, 395 U.S. 621 (1969); *Shapiro v. Thompson*, 394 U.S. 618 (1969),

28  *overruled on other grounds in part by Edelman v. Jordan*, 415 U.S. 651 (1974)); *Griffin v. Illinois*, 351 U.S. 12
    (1956); *Zablocki v. Redhail*, 434 U.S. 374 (1978); *Roe v. Wade*, 410 U.S. 113 (1973), *modified by Planned
    Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992)). Quasi-suspect classifications include

1  370 F.3d at 974. Thus, NDOC must present evidence that the decision(s) made to keep Plaintiff

2  at ESP are reasonably related to legitimate penological interests.

3  Defendants present various reasons that went into determining Plaintiff's classification

4  score which kept him at ESP for a period of time, none of which have to do with his ICC status.

5  First, they demonstrate that a standard classification form is utilized to determine an inmate's

6  classification score whether he is ICC or not. (Doc. # 35-1 at 2 ¶¶ 5-6.) The criteria include

7  history of institutional violence, escape history, disciplinary record, whether the inmate has any

8  holds/detainers, the number of prior felony convictions, percentage time served, whether the

9  inmate is a sex offender, has had a violent episode in the last year, has a death or life without the

10 possibility of parole sentence, has a felony hold/detainer, is in protective custody, disciplinary

11 segregation or detention. (*Id.* at ¶¶ 7-9.) Inmates are reviewed by classification staff every six

12 months, and the goal is to house inmates in the lowest possibly custody level consistent with

13 safety concerns. (Doc. # 35-1 at 4-5 ¶ 12.)

14 Second, they present evidence that his classification score along with his conviction for

15 killing a law enforcement officer, sentence of life without the possibility of parole, STG status

16 and history of an attempted escape justified keeping him at ESP.

17  Defendants submit that Plaintiff was convicted of killing a police officer by shooting him

18 in the back of the head, which resulted in him being deemed a security risk within NDOC.

19 Plaintiff does not dispute that he was convicted of this offense. Instead, he asserts that he is

20 challenging his conviction on appeal. This does not change the fact that this is the security-

21 related information NDOC was provided when Plaintiff was received by NDOC, and it was

22 reasonable for NDOC to rely on this information in determining Plaintiff's classification status.

23 Defendants next point out that Plaintiff was identified by Hawaii as a gang member when

24 he was received by NDOC, which went into Plaintiff's classification determination. While

25 Plaintiff disputes that he is affiliated with a gang, he does not dispute that this is the information

26 Hawaii provided to NDOC regarding Plaintiff. Moreover, as recently as 2012, in view of

27

28 alienage, illegitimacy, and gender, and are subject to a medium level of scrutiny which requires an important governmental interest served by the regulation to justify discrimination. *See Plyer v. Doe,* 457 U.S. 202 (1982); *Lalli v. Lalli,* 439 U.S. 259 (1978); *Craig v. Boren,* 429 U.S. 190 (1976).

1   Plaintiff's claims that he does not have a gang affiliation, Hawaii conducted a re-investigation

2   and confirmed it would not change Plaintiff's STG status. Therefore, it was rational for NDOC to

3   rely on this information in determining Plaintiff's classification status.

4        Defendants also relied on information from Washington and Hawaii regarding an

5   attempted escape in determining Plaintiff's classification status. While Plaintiff disputes whether

6   he actually attempted an escape, he does not dispute that Hawaii and Washington both reported

7   to NDOC that Plaintiff had planned an escape. When Plaintiff disputed the veracity of these

8   incidents, NDOC contacted Hawaii and Washington to investigate Plaintiff's claims and each

9   state affirmed their position that Plaintiff had attempted an escape. Whether or not Plaintiff

10  actually attempted an escape, NDOC was in possession of information regarding an escape

11  attempt in Hawaii and Washington and was reasonably justified in relying on this information in

12  determining Plaintiff's classification status.

13       The court does not doubt the factors utilized by NDOC in determining Plaintiff's

14  classification status and in making the decision to keep him at ESP are reasonably related to

15  legitimate prison interests of safety and security. "Where the connection between a legitimate

16  objective and a prison practice seems to be a matter of common sense, an inmate bears the

17  burden of refuting that connection." *Walker*, 370 F.3d at 975.

18       Plaintiff does not provide any argument that NDOC is not justified in relying on the

19  nature of his conviction, his STG status, or any escape attempt history in determining

20  classification status. Instead, he merely argues that he is appealing his conviction and that he

21  disputes Hawaii and Washington's findings relative to his STG status and escape history. This is

22  not sufficient to raise a genuine dispute of material fact as to whether Defendants' asserted

23  reasons for keeping Plaintiff at ESP are reasonably related to legitimate penological interests.

24       The court finds that Defendants acted rationally in relying on the information provided by

25  the sending institutions, particularly when there is evidence that they investigated Plaintiff's

26  claims that he was not affiliated with a gang and had not attempted to escape and the sending

27  institutions confirmed their conclusions on these matters. Plaintiff provides absolutely no

28  evidence in connection with his opposition to establish that Defendants' practices in determining

his classification status were other than rational. Moreover, he provides no evidence that he was treated differently, in any respect, because of his ICC status, than similarly situated inmates or that there was an intent to discriminate against him because of his ICC status.

Finally, with respect to Plaintiff's claim that he was denied an opportunity to earn money while in prison so that when he got out he would have enough saved up to live on, Defendants provide evidence that he did work and earn money while he was at ESP.

In 2000, Plaintiff was cleared to obtain work in the culinary. (Doc. # 34-12 at 2-3.) He received a pay increase in February 2001. (*Id*. at 4.) He was transferred to a position in the gym in April 2001, and received a pay increase at this position in September 2001 and March 2002. (*Id*. at 5-7.) He was then transferred to a position in prison industries in August 2002. (*Id*. at 8.) He was removed from this position due to a disciplinary finding in December 2003. (*Id*. at 9.) He was then re-assigned to the culinary in June 2004. (*Id*. at 10.) He was subsequently re-assigned to the education department in April 2005. (*Id*. at 11.) He was still assigned to this position as of July 2008. (*Id*. at 12-13.) He remained in this position until March 2011, when he was advised of a decision by the administration that only minimum custody inmates could work in that department; however, he was to be reviewed for other jobs and was re-assigned to the gym. (*Id*. at 14-15.) He received a pay increase in this position in September 2011 and January 2012. (*Id*. at 16-17.)

This evidence belies Plaintiff's claim that he was denied employment opportunities within the prison because of his ICC status. Plaintiff provides no argument or evidence in his opposition to refute this and fails to raise a genuine dispute of material fact on this issue.

For these reasons, the court recommends that summary judgment be granted in Defendants' favor as to each of Plaintiff's equal protection claims.

**C. Standing, Mootness, and Statute of Limitations**

In light of the court's recommendation that summary judgment be granted in Defendants' favor as to each of Plaintiff's claims, it need not reach Defendants arguments regarding standing, mootness and the statute of limitations.

1

## IV. RECOMMENDATION

2      **IT IS HEREBY RECOMMENDED** that the District Judge enter an order **GRANTING**

3 **IN PART AND DENYING IN PART**  Defendants' motions (Docs. # 34/40), as follows:

4      (1) **DENYING** Defendants' motion to dismiss for lack of subject matter jurisdiction

5 under Federal Rule of Civil Procedure 12(b)(1); and

6      (2) Construing Defendants' motion to dismiss for failure to state a claim under Federal

7 Rule of Civil Procedure 12(b)(6) as a motion for summary judgment because it relies on

8 materials outside the pleadings; and

9      (3) **GRANTING** Defendants' motion for summary judgment and entering judgment in

10 favor of Defendants and against Plaintiff as to each of Plaintiff's equal protection claims.

11      The parties should be aware of the following:

12      1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to

13 this Report and Recommendation within fourteen days of receipt. These objections should be

14 titled "Objections to Magistrate Judge's Report and Recommendation" and should be

15 accompanied by points and authorities for consideration by the district judge.

16      2. That this Report and Recommendation is not an appealable order and that any notice of

17 appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed

18 until entry of judgment by the district court.

19

20 DATED: December 11, 2014

21                                                          _____
                                                           WILLIAM G. COBB
22                                                          UNITED STATES MAGISTRATE JUDGE

23

24

25

26

27

28